IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,           )
                             )
        v.                   )      ID No. 91004136DI
                             )
JERMAINE WRIGHT,             )
                             )
        Defendant.           )

**CORRECTED OPINION**

In 1991 Defendant Wright made a videotaped statement to police in which he admitted a role in the murder of Philip Seifert. His confession was used at his trial, and he was convicted of murder and associated offenses. He was sentenced to death. A complex procedural history followed, and Wright was eventually granted a new trial. Presently before the Court is Wright's motion to suppress his confession in which he contends, among other arguments,[1] that it should be suppressed because the *Miranda* warnings administered to him before his confession were insufficient. The State responds that the Court should not consider Wright's argument because it is

---

[1] Wright also contends that his waiver of his *Miranda* rights and his statement were both involuntary. Because of the Court's resolution of the argument centered on the adequacy of the *Miranda* warnings given to Wright, the Court need not reach his other arguments.

foreclosed by the doctrine of the law of the case. Alternatively, the State argues the warnings given to Wright satisfied *Miranda.*

The threshold question here is whether Wright's claims are barred by the law of the case doctrine. Although the Delaware Supreme Court previously held that these claims were procedurally barred by Superior Court Criminal Rule 61, that rule does not apply to these proceedings. The law of the case doctrine differs from the procedural bars of Rule 61 in that the law of the case doctrine extends only to issues which were actually decided. Wright's *Miranda* claims were never presented to the Delaware Supreme Court, much less decided by that Court. Likewise, those claims were never presented to, or decided by, this Court. Consequently, his argument is not barred by the law of the case.

Turning to the merits, the law does not require any specific language be used when administering the warnings so long as they reasonably convey all four of the so-called *Miranda* rights. Importantly, any warning which suggests a limitation on one of those rights renders those warnings invalid. The warnings given in this case contain such a limitation. The interrogating detective told Wright he had a right to appointed counsel if "the State feels you're

diligent and needs one," thus incorrectly suggesting to Wright that he was entitled to appointed counsel only if the State felt he needed one. Accordingly, the ensuing statement may not be used by the State as part of its case-in-chief in Wright's retrial.

**Facts**

Philip Seifert was murdered in January 1991 while working as a clerk at his brother's liquor store, known as the HiWay Inn, which was located just outside the Wilmington city limits on Governor Printz Boulevard. Since the HiWay Inn was located outside the city the Delaware State Police had responsibility for investigating this crime. The police had little evidence to go on when the investigation began—there were no eye witnesses to the shooting, the murder weapon was never recovered, no shell casings were found, and there were no fingerprints at the scene other than those of the store owner. In an effort to develop a lead, State Police Detective Edward Mayfield, the chief investigating officer, walked the local neighborhoods at night offering twenty dollar bills in exchange for information. Little or no information was forthcoming until an anonymous note appeared at the HiWay Inn stating that someone named "Marlo" was involved in the killing. Police knew that Wright's street name was "Marlow," and

they quickly identified him as a possible suspect. They lacked sufficient evidence to obtain a warrant for Wright's arrest for the HiWay Inn murder, but they did have enough to arrest him for two unrelated crimes which had taken place within the Wilmington city limits. The Wilmington Police obtained a warrant to arrest him for these unrelated crimes and a daytime warrant to search his home.

Wright's home was located within the city, so shortly after six a.m. on January 30, 1991 a Wilmington police S.W.A.T. team executed the arrest warrant and assisted other officers in searching Wright's home. Wright was immediately taken to Wilmington Police Department's central headquarters where he was searched and booked. He was then placed in an interrogation room where he was shackled to a chair. By design, the room, which measured seven feet by seven feet, had no windows or clock. It contained only a chair for the suspect, a small table, and a chair for the interrogator. There was also a camera mounted on the ceiling which could be used to make video and audio recordings of interviews taking place in the room. The police also had the capability of transmitting the audio of interviews from the interrogation room to nearby detective offices where others could listen in.

Wright's first interrogation was conducted by Detective Merrill of the Wilmington Police Department, who questioned him about one of the unrelated crimes. The detective later testified that he advised Wright of his *Miranda* rights prior to questioning. By 1991 *Miranda* was 25 years old, and police had considerable experience with it. Most, if not all, police agencies had developed standard routines in order to avoid the "litigation risk of experimenting with novel *Miranda* formulations."[2] One such tool was the use of cards from which to read the *Miranda* warnings. Indeed, Delaware judicial opinions written prior to Wright's interrogation often refer to the use of a "Miranda card" by officers administering those warnings.[3] Nonetheless, in the instant case Detective Merrill did not use a Miranda card, but instead recited the warnings from memory.

---

[2] *Florida v. Powell*, 559 U.S. 50, 64 (2010).

[3] *E.g.*, *State v. Oakes*, 373 A.2d 210, 212 (Del. 1977) (Delaware State Police Officer "read defendant the *Miranda* warnings from a card and asked if defendant understood his rights."); *State v. Aiken*, 1992 WL 301739, at *3 (Del. Super. Oct. 9, 1992) (Before interrogating defendant on two occasions in 1991 police used a "*Miranda* card designed for police to use when questioning suspects."); *State v. Kopera*; 1991 WL 236970, at *1 (Del. Super. Oct. 17, 1991) (Detective "read to Mr. Kopera the Miranda rights contained on the Delaware State Police Miranda rights card."). *See also United States v. Velasquez,* 885 F.2d 1076, 1079 (3d Cir. 1989) ("[Delaware State Police officer] Durnan testified that he read Velasquez *Miranda* warnings from a card, reading slowly, in English, and stopping after each sentence to ask if she understood. She answered in the affirmative each time. Durnan also testified that he provided Velasquez with a card containing the *Miranda* warnings in Spanish."); *United States v. Smith,* 679 F. Supp. 410, 411 (D. Del. 1988) ("At about 11:25 a.m. [Delaware State Police] Corporal Durnan handcuffed Mr. Smith, placed him under arrest and read him the *Miranda* warnings from a card."). In one case in which the adequacy of the warnings was contested the Delaware Supreme Court noted that the card "was the best evidence" of the warnings actually given to the defendant. *Walley v. State*, 622 A.2d 1097, 1993 WL 78221, at *2 (Del. 1993) (TABLE).

The risk, even for seasoned detectives, of not using a Miranda card is illustrated by testimony elicited in 2009 from Detective Merrill by the State during the Rule 61 hearing. The Deputy Attorney General asked Detective Merrill:

> Q. (By State): Do you recall, sitting here, what rights you recited to him?
>
> A. Yes.
>
> Q. And can you tell the Court what they were?
>
> A. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to have an attorney present during this questioning, and you can terminate the questioning at any time.

These warnings omitted the right to appointed counsel. The Court does not believe that eighteen years later Detective Merrill could remember the precise warnings he gave Wright, even though the State asked him and he said he remembered them.[4] It does underscore the risk, however, of misstating the *Miranda* rights when giving them from memory.

The next detective to question Wright was Wilmington Detective Robert Moser. At various times throughout this prolonged litigation Detective Moser offered conflicting testimony about whether he

---

[4] In an earlier hearing Detective Merrill was also asked to recite the warnings he gave to Wright, and in that hearing he recited them in a manner which satisfied *Miranda*.

administered *Miranda* warnings to Wright. At a pretrial suppression hearing he testified he gave such warnings, but a few months later at Wright's trial he testified he did not give any warnings because Wright had already been "*Mirandized.*" In a 2009 evidentiary hearing Detective Moser again testified that he gave those warnings, but this time he added he obtained a written acknowledgement of those warnings from Wright. Contemporaneous judicial opinions from the period often refer to the use of written *Miranda* waivers,[5] and Detective Moser stated that it was standard procedure in 1991 to obtain written acknowledgements and waivers before questioning a suspect. No written waiver form from any of the three interrogations of Wright, however, has ever been produced.

Detective Moser's unrecorded interrogation began with a discussion about the second unrelated Wilmington crime. According to the detective, the atmosphere during his interrogation was relaxed—he stated he leaned back in his chair and listened to Wright,

---

[5] *Liu v. State*, 628 A.2d 1376, 1380 (Del. 1993) (Expert testified in 1990 trial on Defendant's understanding of warnings "after examining the *Miranda* waiver forms the police use."); *Black v. State*, 616 A.2d 320, 322 (Del. 1992) (During the 1990 interrogation Defendant "was once again advised of his *Miranda* rights and signed a form to that effect."); *Torres v. State*, 608 A.2d 731, 1992 WL 53406, *4 (Del. 1992) (TABLE) ("The record also shows that Torres voluntarily waived his *Miranda* rights by executing a written *Miranda* waiver form prior to giving each tape-recorded statement."); *Lodge v. State*, 599 A.2d 413, 1991 WL 134474, at *1 (Del. 1991) (TABLE) (Defendant completed "another *Miranda* waiver form and relinquishing his *Miranda* rights for a second time."); *Deputy v. State*, 500 A.2d 581, 586 (Del. 1985) (Defendant "signed a written [Delaware State Police] form acknowledging the *Miranda* warnings."); *State v. Dyson*, 1989 WL 48580, at *1 (Del. Super. May 5, 1989) ("The defendant executed a *Miranda* warning waiver form."); *State v. Brophy*, 1986 WL 13100, at * 4 (Del. Super. Sept. 12, 1986) (Detective "testified that he watched the defendant sign the *Miranda* form.").

who seemed anxious to talk. During the course of the day Wright was given a submarine sandwich and two sodas. Except for occasional bathroom breaks, Wright remained in the interrogation room prior to Detective Mayfield's interrogation. The relaxed atmosphere during Detective Moser's interrogation was interrupted when a second State Police detective assigned to the case burst into the room and told Wright, "I'm in charge here and you're going to tell me what I want." Wright refused to speak to the interloper, who apparently did not stay long. After the second State Police detective departed, Wright again started to talk with Detective Moser. At some indeterminate time during the interrogation, Wright brought up the subject of the HiWay Inn killing. At first, according to Detective Moser, Wright suggested that someone else was involved, but as the questioning wore on Wright's story shifted and he eventually told Detective Moser that he was involved. Wright stated that an acquaintance, Lorinzo Dixon,[6] was the mastermind of the crime and threatened to kill him if he did not shoot the clerk.

---

[6] Dixon was arrested later and denied any complicity in the HiWay Inn killing. He ultimately pled to robbery in the first degree and possession of a firearm during the commission of a felony in exchange for a sentence he believed would result in his release after serving an additional five months. At a 2009 Rule 61 evidentiary hearing Dixon denied any complicity and testified he entered his plea only because his friend Wright was sentenced to death for a crime they did not commit and Dixon was afraid the same thing would happen to him.

Detective Mayfield listened to Detective Moser's interrogation via a remote connection to a nearby detective's office. Eventually Detective Mayfield decided he had heard enough and was ready to interrogate Wright himself.[7] This interrogation began roughly 13 hours after Wright was first arrested. Wright was moved to a conference room where video equipment had been set up, and Detective Mayfield began to question Wright ostensibly shortly after 7:30 p.m.[8] Unlike the previous interrogations, this one was videotaped.

Despite the fact that the police had the capability of recording Wright's first interrogations using the camera mounted on the ceiling, neither of the first two interviews nor the warnings alleged to have been given to Wright was recorded. Detective Moser explained the absence of recordings; "believe it or not, back then video tape was expensive." On the other hand, Detective Mayfield told the Court that the "Delaware State Police practice at that time was we always audio or videotape the interviews of people." The State offered no

---

[7]  During the Rule 61 evidentiary hearing, Detective Mayfield objected to the nomenclature "interrogation" and insisted his interaction with Wright was an "interview." The Court has chose to use the term "interrogation" to refer to questions asked of a suspect, and the tem "interview" to refer to questions asked of a non-suspect (*i.e.* a witness). The Supreme Court uses the term "interrogation" in *Miranda* and its progeny, and the court will use it here. It does not ascribe any negative connotation to the term.

[8]  Detective Mayfield at the beginning of the interrogation said that the time was 7:34 p.m., and indeed a clock behind Wright in the video indicated it was 7:34. However, the video shows that throughout the interrogation, the hand of the clock never moved. This creates considerable doubt as to when the interrogation actually began.

9

explanation why, even if video tape was expensive, audio recordings were not made of the first two interviews.

Turning to Wright's condition at the time of the interrogation, Detective Mayfield testified that in 1991 it was the practice of the State Police not to interview suspects who were intoxicated on drugs or alcohol. According to the detective, this practice as well as his training often caused him to delay interviews when the suspect was thought to be intoxicated. In fact, prior to interrogating Lorinzo Dixon the detective asked Dixon whether he was intoxicated. He asked no such question of Wright, however.

The trial judge found that Wright was intoxicated on heroin while he was being interrogated. At least part of that finding was based on her comparison of Wright's demeanor on the videotaped confession with his later demeanor in the courtroom. Substantial other evidence corroborates her finding. The search of Wright conducted when he was booked that morning failed to disclose that Wright was then in possession of heroin. The trial judge found that he used the secreted heroin during bathroom breaks occurring during the day. Another indication of his intoxication was the bizarre behavior Wright exhibited during the Moser interview. At one point,

10

he began speaking softly, almost inaudibly, because he feared his answers were being overheard by others. Later, Wright curled up in a fetal position under the table in the interview room. At yet another point during the Moser interrogation, Wright insisted on writing down his answers on a piece of paper, passing the paper to Detective Moser who in turn handed it back to Wright, whereupon Wright would eat it.

In the 2009 hearing Wright presented unopposed substantial credible testimony from several nationally-recognized experts leading to the conclusion that Wright's confession was unreliable. That expert testimony was discussed in this Court's 2012 opinion.[9] Some examples will suffice to describe its nature and import. There was expert testimony that Wright was withdrawing from heroin intoxication during the last interrogation, and that persons undergoing heroin withdrawal will do or say anything in order to get another fix. Still another expert testified about Wright's intellectual deficits, noting he was profoundly impaired to a point akin to mental retardation. Another expert testified that he administered a Gudjonsson Suggestibility Scale, which is a recognized test used to determine the degree to which a person is subject to suggestion. That

---

[9] *State v. Wright,* 2012 WL 1400932, at *12-18 (Del. Super. Jan. 3, 2012).

test showed that Wright was "extremely suggestible" and was more likely than 998 people out of 1000 to change his answers in response to suggestion or pressure from his interrogator. The expert pointed to multiple instances during the recorded interrogation when Wright changed his answers in response to suggestions from Detective Mayfield. For example, a witness who saw two unidentified individuals fleeing the scene told police they were wearing dark clothing. In the interrogation Wright told the police he did not remember what pants he was wearing. The transcript shows that Detective Mayfield steered him into stating he was probably wearing jeans:

EM [Detective Mayfield]: What about yourself, what were you wearing?

W: I can't really say. I forgot. It's been, I can't really say.

EM: You have no idea at all?

W: No, sir.

EM: Do you usually wear jeans?

W: Yeah.

EM: Well, do you think you had jeans on that night?

W: Yeah. I probably had jeans on.

Although forewarned of the array of expert evidence Wright intended to call and the substance of their proposed testimony, the State offered nothing to contradict it.

There is other evidence calling into question the credibility of Wright's confession. During his interrogation Wright repeatedly got key facts wrong. For example, he stated the caliber of the pistol he used was different than the caliber of the gun actually used to kill Mr. Seifert. At another time during the interrogation he told the detective that one shot was fired, when in fact there were three. At still another point Wright told the police that Mr. Seifert was lying on the floor when he fled the liquor store. In fact the victim's head and chest were still on the counter when he was first discovered.

The unopposed expert evidence and the inconsistencies between Wright's statement and the facts led this Court to conclude that his statement was unreliable:

> In particular, the court finds that (1) Wright likely did not understand his rights when given the *Miranda* warnings; (2) Wright was predisposed to being easily persuaded; (3) Wright's lack of sleep, the length of his interrogation, his heroin intoxication, and the early withdrawal stages all exacerbated his predisposition to suggestion; and (4) the interrogation was designed in part to suggest the "correct" answers to Wright.[10]

---

[10]  *Wright*, 2012 WL 140932, at *18.

The State urges that despite all of this, Wright's confession was reliable because he told Detective Mayfield things only the killer would know. The State has never explained, however, precisely what information Wright knew (and got correct) that "only the killer would know."

The notion that Wright knew information only the real killer would know is belied by the fact that at least some information was likely fed to him. The Court discussed a moment ago Wright's amenability to suggestion and how Detective Mayfield's questioning at least sometimes steered Wright in the direction of "correct" answers. Wright contends that he was also fed information about the killing during the Moser interrogation, a contention that the trial judge rejected because the only thing Detective Moser knew about that killing was the sketchy information contained in the so-called State Police pass-on.[11] Since then, new evidence—unavailable to the trial judge—has come to light which leads the Court to conclude that Detective Moser had access to far more information than what was available from the pass-on.

---

[11] This is a document routinely created by police departments to circulate basic information about unsolved crimes to other officers.

Detective Mayfield denied providing any information to Detective Moser about the HiWay Inn killing. According to Detective Mayfield, at that time there was considerable inter-agency rivalry between the Delaware State Police and the Wilmington Police, and those agencies were reluctant to share information with each other about their cases. The detective testified he would therefore not have shared information about the HiWay Inn killing with the Wilmington Police, including Detective Moser. The Court finds otherwise. There is substantial evidence that the Wilmington Police cooperated with the Delaware State police in connection with the HiWay Inn murder:

- The entire operation was geared toward obtaining evidence in the HiWay Inn case. Detective Merrill met with the Wilmington Police in the early morning prior to the execution of the arrest and search warrants. He was present when Wright was arrested and when his home was searched. When he was asked about the presence of Delaware State Police detectives Wilmington Detective Merrill testified:

  Q. And the Delaware State Police detectives?

  A. They were there also.

  Q. What was their reason for being there?

  A. It was their case. They were investigating another case and they thought there might be some evidence in this one.

- Detective Mayfield listened by remote connection as the Wilmington detectives interrogated Wright.

- Detective Mayfield met with Detective Moser during the latter's interrogation of Wright and urged Moser to "Keep it up. It takes a long time. Do the best you can. We don't have anything now, just try to get what you can."

- Detective Mayfield asked Detective Moser to sit in during the former's interrogation of Wright.

- Detective Mayfield again asked Detective Moser to sit in on his interrogation of co-perpetrator Lorinzo Dixon, who was arrested weeks later and who was not implicated in the unrelated city crimes for which Wright was arrested.

- Detective Mayfield authored a contemporaneous report in which he wrote he and "the Wilmington Police Detectives worked hand in hand with suspects, informants and anonymous phone calls and/or messages, in developing a suspect."

- Detective Mayfield met with Detective Browne of the Wilmington Police to discuss whether the HiWay Inn killing could have been related to an attempted robbery of a nearby liquor store, which occurred roughly an hour before the HiWay Inn robbery/murder.

When the trial judge ruled that Detective Moser could not have fed information to Wright because Moser was unaware of such information, she did not know that Detective Mayfield conferred with Detective Moser during the latter's interrogation. In light of this new

16

evidence and the other evidence described above, the Court now finds it is more likely than not that Wright was fed information "that only the killer would know."[12]

It is against this factual backdrop that Wright challenges the sufficiency of the *Miranda* warnings give to him. Detective Mayfield's warnings consisted of the following:

> Basically, you have the right to remain silent. Anything that you say can and will be used against you in a court of law. You have the right, right now, at any time, to have an attorney present with you, if you so desire. Can't afford to hire one, if the state feels that you're diligent and needs one, they'll appoint one for you. You also have the right at any time while we're talking not to answer.

He concluded his *Miranda* warnings with the following:

> Do you understand what I've asked [sic.] you today? Okay. Do you also understand that what we're going to be taking is a formal statement and that this statement's going to be video taped? Okay. Are you willing to give a statement in regards to this incident? Say yes or no.

The alleged defect is that Wright was told: "Can't afford to hire one, if the state feels that you're diligent and needs one, they'll appoint one for you." Detective Mayfield denied he used the phrase "if you are diligent" and insisted he said "if you are indigent." In the past the

---

[12] The law of the case doctrine does not preclude this Court from changing its earlier finding. That doctrine is discussed in some detail in the "Analysis" portion of this opinion. Suffice for now, the Delaware Supreme Court has held "[t]he law of the case doctrine does not preclude this Court or the Superior Court from reexamining the prior rulings in this case when the factual premises of those prior rulings are demonstrated to have been mistaken." *Hamilton v. State,* 831 A.2d 881, 887 (Del. 2003). Given the new evidence about Detective Mayfield conferring with Detective Moser, the Court is not bound by the law of the case here.

17

State has asserted that, because of his experience, Detective Mayfield most likely used the word "indigent." According to the State, "[a]t the time Detective Mayfield read Wright his *Miranda* warnings, he had been a State Trooper for 9 years, and had made thousands of arrests and administered *Miranda* warnings in all non-traffic arrests."[13] The detective's experience, however, hardly suggests that he gave proper *Miranda* warnings here. A few weeks after giving Wright his *Miranda* warnings, the detective once again had occasion to administer those warnings, this time to Lorinzo Dixon. Once again he dropped the ball, telling Dixon:

> What I'm gonna do first is read your rights to you. Okay? You have the right to remain silent. If you give up your right to remain silent, anything you say can and will be used against you in a court of law. You have the right at any time to request a lawyer, if, ah, if you can afford it. Or if you're, or if the court finds out that you're negligent for it. Okay? You also at any time have the right to answer any and all questions. Do you understand those rights?

In its 2012 opinion the Court found as fact that the detective used the phrase "if you are diligent" when he administered the warnings to Wright. There is more than ample evidence to support this finding. The transcript of that interrogation prepared by the State Police reads "if you are diligent." The State has sought to

---

[13] Supreme Court docket in No. 10, 2012, D.I. 34 at 14.

characterize this as a "typographical error," yet it stipulated to the accuracy of that transcript and Detective Mayfield also twice testified it was accurate. The Court itself has reviewed the videotape of the confession many times and finds that the detective used the phrase "if you are diligent." In a sense this is much ado about nothing because even if the detective used the phrase "if you are indigent" the warnings were flawed because he indisputably told Wright he could have a court-appointed lawyer "if the State feels . . . [you] need[] one." Nonetheless, the Court notes that, for the reasons the second part of the Analysis section below, the phrase "if you are diligent" in its own right is sufficiently misleading to negate the effectiveness of the warnings.

## Procedural history

Because the application of the law of the case is an issue here, it is necessary to present more detail about the complex procedural history than might ordinarily be required. Perhaps the clearest way to do this is to summarize the salient procedural events in chronological order.

- Before his trial Wright moved before trial to suppress his confession, but did not assert the *Miranda* warnings given to him were inadequate. This Court found that Wright's waiver of his *Miranda* rights was knowing, voluntary and

intelligent, and denied the motion to suppress. No argument was made about the adequacy of the warnings given by Detective Mayfield and there was no discussion of those warnings in the court's opinion.

- Wright was tried before a jury and convicted of murder and related crimes. This Court sentenced him to death.

- Wright appealed his conviction and sentence to the Supreme Court, which affirmed both in 1993.[14]

- In 1994 Wright filed his first motion for post-conviction relief in which he challenged the adequacy of his representation at both the guilt and penalty phases of his trial. This Court found that Wright had effective representation during the guilt phase, but that his representation during the penalty phase was ineffective. It therefore granted him a new penalty hearing. The result did not change after the second penalty hearing, and Wright was again sentenced to death.

- In 1996 the Delaware Supreme Court affirmed the death penalty imposed after Wright's second penalty hearing. It also affirmed this Court's conclusion that Wright's counsel was not ineffective during the guilt phase of his trial.[15]

- In 1998 Wright filed another motion for post-conviction relief. One of his claims was that that "he received ineffective assistance of counsel in conjunction with his 1992 trial and appeal." The basis for that claim was, in part, his trial counsel's failure to argue that his waiver of his *Miranda* rights was not knowing, intelligent and voluntary. There was no contention that the warnings themselves were inadequate. This Court denied Wright's motion.[16] It did not have occasion to review the warnings actually given to Wright and did not do so in its opinion.

---

[14] *Wright v. State*, 633 A.2d 329 (Del.1993).
[15] *Wright v. State*, 671 A.2d 1353, 1357-9 (Del. 1996).
[16] *State v. Wright*, 1998 WL 734771 (Del.Super.)

- Wright appealed the denial of his 1998 Rule 61 motion, and in 2000 the Supreme Court affirmed by judgment order this Court's 1998 denial of that motion.[17]

- Wright was resentenced after the Supreme Court affirmed the denial of his motion for post-conviction relief and his execution was scheduled for May 25, 2000. Two weeks before his scheduled execution Wright filed a petition for a writ of habeas corpus in the federal court, and that court promptly issued a stay of Wright's execution.

- In 2003, while the federal habeas corpus matter was pending, Wright filed his third motion for post-conviction relief. This Court stayed any resolution of that matter pending disposition of the petition for habeas corpus.

- In 2008 Wright filed his fourth motion for post-conviction relief in this Court. At the time his third Rule 61 motion was still pending. Wright asked that consideration of his fourth motion be stayed. Shortly thereafter the parties and the federal court agreed it would be more efficient if this Court were to first resolve the pending Rule 61 motions before it addressed the federal petition.[18]

- After this Court again took up the pending Rule 61 motions, Wright filed an amended fourth motion in which he asserted an actual innocence claim.

- In May 2009 Wright filed a "Consolidated" Rule 61 motion, which consolidated the claims presented in his third, fourth and amended fourth motions.

- In September 2009 Wright amended the consolidated motion to present his *Miranda* claims. Thereafter followed a lengthy series of evidentiary hearings, briefings and oral arguments culminating in this Court's 2012 opinion.

---

[17] *Wright v. State,* 2000 WL 139974 (Del.)

[18] Federal law requires that a petitioner exhaust all of his claims in the state court before presenting them in federal court. 28 U.S.C. § 2254(b)(1)(A). At the time Wright's federal petition was a "mixed petition," meaning that it contained both exhausted and unexhausted claims. The apparent purpose of the third and fourth Rule 61 motions was to present the unexhausted claims in the state court. Rather than dismiss the mixed petition, the federal court allowed Wright the opportunity to present those claims in state court.

- In January, 2012 this Court issued an opinion in which it held that Wright's conviction and sentence was constitutionally infirm and that Wright was entitled to a new trial. It found that (1) the *Miranda* warnings given to Wright were inadequate, and (2) exculpatory evidence had been withheld from him.[19]

- In 2013 the Supreme Court reversed this Court's 2012 decision and remanded the matter to this court for re-imposition of the death penalty. The Supreme Court found that Wright's *Miranda* claims were procedurally barred by Superior Court Rule 61(i)(4). It found that Wright's *Brady* claim was not procedurally barred, but a divided Court held that Wright had failed to show prejudice from the withholding of the evidence.[20]

- This matter was remanded to this Court, which re-imposed Wright's death penalty, whereupon Wright now appealed to the Delaware Supreme Court. This time, in a 2014 opinion, the Supreme Court found that possibly exculpatory evidence which this Court rejected in 2012, when coupled with other withheld exculpatory evidence, made out a claim of a constitutional violation sufficient to warrant a new trial.[21]

- The matter is now on remand, and Wright has moved to suppress his confession. This is the court's opinion on that motion.

## Analysis

In Part I of this opinion the Court will consider the law of the case doctrine and will explain why it does not bar consideration of

---

[19] *State v. Wright*, 2012 WL 1400932 (Del.Super.), rev'd 67 A.3d 319 (Del. 2013)
[20] *State v. Wright*, 67 A.3d 319 (Del. 2013)
[21] *Wright v. State*, 91 A.3d 972 (Del. 2014)

Wright's *Miranda* argument. In Part II it will discuss why *Miranda* warnings were inadequate.

## I. The law of the case doctrine does not bar Wright's *Miranda* claim.

In its 2013 opinion the Delaware Supreme Court held that Wright's *Miranda* claim was barred:

> The Superior Court decided to address the adequacy of Wright's *Miranda* warnings *sua sponte.* It listened to the same videotaped confession that was the subject of a motion to suppress before trial; a claim of error on direct appeal; the second Rule 61 motion; and the appeal of that motion. Each challenge was rejected after addressing Wright's understanding of his *Miranda* rights. In deciding Wright's fourth postconviction motion, the Superior Court did not have any new evidence upon which to conclude that Wright's warnings were defective. "[A] defendant is not entitled to have a court re-examine an issue that has been previously resolved 'simply because the claim is refined or restated.' " Wright did not ask for that relief, but if he had, there would be no basis on which to find that he overcame the procedural bar[22]

At first blush it may seem strange for this Court to hold that Wright's *Miranda* claim is not barred when in 2013 the Supreme Court held that the claim was procedurally barred by the procedural rule governing motions for post-conviction relief. The result is different here because different procedural rules are in play. In 2013 the

---

[22] *State v. Wright,* 67 A.3d 319, 323 (Del. 2013). The Supreme Court was apparently misinformed about what occurred in this case. Contrary to the statement that "Wright did not ask for that relief," Wright filed an amended motion expressly alleging that the *Miranda* warnings given to him were defective. And contrary to the statement that this court "addressed the issue sua sponte," there were multiple rounds of briefing and oral arguments specifically addressing the *Miranda* issue.

Supreme Court held that Criminal Rule 61(i)(4)[23] barred consideration of Wright's *Miranda* claim because the admissibility of his confession had previously been adjudicated.[24] In the Supreme Court's words, under Rule 61 a "defendant is not entitled to have a court re-examine an issue that has been previously resolved simply because the claim is refined or restated."[25]  But this is no longer a post-conviction proceeding, and, as the State tacitly concedes,[26] Criminal Rule 61(i)(4) no longer applies.[27]  It shows no disrespect to the Supreme Court, therefore, for this Court to again consider the *Miranda* claim is procedurally barred.

No doubt there are some similarities between Rule 61(i)(4) and the law of the case doctrine,[28] but there is at least one critical difference:    The law of the case doctrine—unlike Criminal Rule 61(i)(4)—applies only to "specific issues" which have actually been litigated and decided.  Although the Supreme Court and this Court have previously considered certain contentions about Wright's confession, the adequacy of his *Miranda* warnings was not among

---

[23]   At the time of the Supreme Court's 2013 opinion Criminal Rule 61(i)(4) provided  that any post-conviction ground "for relief that was formerly adjudicated ... is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice."

[24]   *State v. Wright*, 67 A.3d 319, 323 (Del. 2013).

[25]   *Id.* (internal quotation marks omitted).

[26]   The State does not rely upon Criminal Rule 61 in its response to the motion to suppress.

[27]   The State tacitly concedes the point because it does not argue that the Supreme Court's holding is dispositive of the issue here.  Nor does it argue that Criminal Rule 61, upon which the Supreme Court relied, still applies here.

[28]   *Hoskins v. State*, 102 A.3d 724, 729 (Del. 2014).

them. Because this "specific issue" has never been decided in this matter, those previous rulings are not law of the case with respect to this issue.

Before discussing the doctrine the court must mention some shorthand it has decided to employ. Throughout this opinion this court refers to the fact that Wright never previously presented, and the courts never decided, whether the *Miranda* warnings given to him were adequate. In point of fact, Wright did raise the issue in 2009 and it was decided in his favor in this court's 2012 opinion. The Supreme Court reversed without reaching the merits of the *Miranda* claim. The State does not contend for present purposes that the rulings following Wright's assertion of his *Miranda* claim constitute law of the case. It argues instead that rulings made *before* he asserted that claim are law of the case. Rather than repeatedly draw this distinction throughout this opinion the court, except where otherwise noted, will be referring to the rulings occurring before Wright asserted his claim.

## A. The doctrine applies only to issues which were actually decided.

The Delaware Supreme Court has recently described the law of the case doctrine in *Hoskins v. State* wherein it wrote:

25

Under the law of the case doctrine, issues resolved by this Court on appeal bind the trial court on remand, and tend to bind this Court should the case return on appeal after remand. The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation The law of the case doctrine requires that there must be some closure to matters already decided in a given case by the highest court of a particular jurisdiction. Yet the doctrine is not inflexible in that, unlike *res judicata,* it is not an *absolute* bar to reconsideration of a prior decision that is clearly wrong, produces an injustice or should be revisited because of changed circumstances.[29]

An essential element of the doctrine is that the "specific legal principle" has previously been applied.[30] In other words, the issue in question must have been "actually decided" in the earlier proceeding.[31] Our Supreme Court has repeatedly stated in one fashion or another that a fundamental principle of the law of the case doctrine is that the specific issue must actually have been decided:

- "The 'law of the case' is established when a *specific legal principle* is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation."[32]
- "The prior decisions by this Court on any *adjudicated issue* . . . became the law of the case in all subsequent stages of his continuing criminal proceedings."[33]

- "[A] court's decision in the first appeal is the law of the case on all questions *involved and decided.*"[34]

---

[29] *Id.* at 729 (emphasis in original) (internal alterations, footnotes, and quotation marks omitted).
[30] *Id.* (internal quotation marks omitted).
[31] *May v. Bigmar, Inc.*, 838 A.2d 285, 288 n.8 (Del. Ch. 2008).
[32] *Kenton v. Kenton,* 571 A.2d 778, 784 (Del.1990) (emphasis added).
[33] *Brittingham v. State,* 705 A.2d 577, 579 (Del. 1998) (emphasis added).

- "The doctrine is not inflexible, however. It applies only to those matters necessary to a given decision and those matters which were *decided on the basis of a fully developed record.* Where, as here, this Court could not have envisioned the full factual posture of a particular claim, the prior ruling cannot be considered to be the law of the case." [35]

- "Arguments which have been *previously adjudicated* resulting in rulings which became the law of the case may not be reasserted in later proceedings." [36]

- "The doctrine of law of the case, a doctrine referring to the principle that issues once decided in a case, that recur in later stages of the same case, are not to be redetermined, could be applicable here *if the issue was actually litigated* and necessary to the court's judgment." [37]

- "[T]he trial court on remand is not constrained by the mandate as to *issues not addressed* on appeal." [38]

- Although the trial court is required to make a determination consistent with the appellate court's review, it is also "free to make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court *not settled by the decision.*" [39]

The federal courts also hold that the law of the case doctrine applies only to issues which have actually been decided. "The law-of-the-case doctrine only applies to issues the court actually decided." [40]

---

[34]   *Marine v. State*, 624 A.2d 1181, 1184 n.5 (Del. 1993) (emphasis added).
[35]   *Zirn v. VLI Corp.*, 681 A.2d 1050, 1062 n.7 (Del. 1996) (emphasis added).
[36]   *Fenton v. State*, 567 A.2d 420, 1989 WL 136962, at *1 (Del. 1989) (TABLE) (emphasis added).
[37]   *French v. French*, 622 A.2d 109, 1992 WL 453269, at *3 (Del. 1992) (TABLE) (emphasis added).
[38]   *Cede & Co. v. Technicolor, Inc.* 884 A.2d 26, 38  (Del. 2005) (emphasis added).
[39]   *Motorola Inc. v. Amkor Technology, Inc.*, 958 A.2d 852, 859 (Del. 2008) (emphasis added).
[40]   *John B. v. Emkes*, 710 F.3d 394, 403 (6th Cir. 2013).

This means that the issues "were fully briefed and squarely decided in an earlier appeal."[41] According to the United States Supreme Court, the law of the case doctrine "presumes a hearing on the merits" and it will not apply when the "case does not involve a previous consideration of the merits."[42] In short, as a federal court of appeals put it, the "law of the case doctrine precludes a court from reconsideration of *identical* issues."[43]

The doctrine's requirement that the "specific issue" has previously been raised gives rise to the key difference between the law of the case doctrine and the procedural bars found in Criminal Rule 61: the law of the case doctrine does not extend to issues which could have been raised but were not. Retired Superior Court Judge Bernard Balick,[44] the draftsperson of Rule 61, included 61(i)(4) because "[i]t is essential to have some principle of res judicata for issues that were previously decided."[45] However, the law of the case doctrine is not as broad as *res judicata* and does not reach issues which "could have been" presented. In *Insurance Company of America v. Barker*, the

---

[41] *Perkins v. Am. Elec. Power Fuel Supply, Inc.,* 91 F. App'x 370, 374 (6th Cir. 2004) (*quoting* 1B James Wm. Moore, Moore's Federal Practice ¶ 0.404[1], at II–5 (2d ed.1996)).

[42] *United States v. Hatter,* 532 U.S. 557, 566 (2001).

[43] *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 308, 512 n.3 (6th Cir. 2000) (quoting *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997)(emphasis added)..

[44] Judge Balick also served with distinction as a Vice Chancellor of the court of chancery.

[45] B. Balick, *Proposed Rule for Post Conviction proceedings in the Superior Court of the State of Delaware*. Reported at 2012 WL 1400932 *52 (Del.Super.)

Delaware Supreme Court held that "[t]he law of the case does not have the finality of *res judicata* since it only applies to "litigated issues and does not reach issues which could have been but were not litigated."[46]  This principle is commonly applied in other jurisdictions, including opinions from other jurisdictions cited by the Delaware Supreme Court.  For example, in law of the case matters our Supreme Court has relied upon[47]  the Third Circuit's opinion in *Bankers Trust Co. v. Bethlehem Steel Corp.*[48]  There the Third Circuit held that when determining whether an opinion constitutes law of the case that opinion must be considered "with particular reference to the issues considered."[49]

The Delaware Supreme Court's opinion in *In re Walt Disney Derivative Litigation* illustrates the necessity of determining precisely what was decided in the earlier ruling:

> The appellants base their contrary argument upon their reading of this Court's opinion in *Brehm v. Eisner.* A "central holding" of *Brehm,* which the appellants claim is the "law of the case," is that the Disney board had a duty to approve the OEA because of its materiality. The appellants misread *Brehm.* There, in upholding a dismissal of the complaint in a procedural setting where the complaint's well-pled allegations must be taken as true, we observed that "in this case the economic

---

[46]  628 A.2d 38, 41 n.5 (Del. 1993).
[47]  *Insurance Co. of Am. v. Barker,* 628 A.2d 38 (Del. 1993); *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26 (Del. 2005); *Wright v. Moore,* 953 A.2d 223 (Del. 2008).
[48]  761 F.2d 943 (3d Cir. 1985)
[49]  *Id.* at 950.

exposure of the corporation to the payout scenarios of the Ovitz contract was material, particularly given its large size, for purposes of the directors' decision-making process." Contrary to the appellant's position, that observation *is not the law of the case, because in Brehm this Court was not addressing, and did not have before it,* the question of whether it was the exclusive province of the full board (as distinguished from a committee of the board) to approve the terms of the contract. . . .Therefore, in deciding the issue of which body-the full board or the compensation committee-was empowered to approve the OEA, the Chancellor was not constrained by any pronouncement made in *Brehm.*[50]

Thus, this Court is tasked with examining the earlier opinions in this matter to determine whether any court has specifically held that the *Miranda* warnings actually given to Wright were adequate. No such holding exists.

## B. Neither the Supreme Court nor this Court has ever addressed the adequacy of the *Miranda* warnings given to Wright.

In his motion to suppress Wright made the point that no court has ever considered the adequacy of the *Miranda* warnings given to him. The State did not dispute that in its response, but instead relied upon rulings that Wright's waiver was voluntary or that his confession was voluntary.[51] Ever since Wright first raised his *Miranda* claim the State has responded with this contention. For

---

[50] 906 A.2d 27, 54 (Del. 2006) (emphasis added).

[51] For example, on one occasion this Court summarized its earlier rulings, noting that "the Court [previously] examined the totality of circumstances including the behavior of the interrogators, the conduct of the defendant, his age, his intellect, his experience, and all other pertinent factors."

example, in its brief before the Delaware Supreme Court, for example, the State wrote "[n]o issue has been more heavily litigated in Wright's case than the voluntariness of his confession.[52] In that same brief it asserted that this Court's earlier opinions were about the "voluntariness of Wright's confession."[53] But these considerations are distinct from the adequacy of the warnings given to Wright.

To be effective, a waiver of *Miranda* rights must be "knowing, intelligent and voluntary."[54] The adequacy of the warnings given to the suspect goes to the "knowing and intelligent" standard: "The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege."[55] On the other hand, the "voluntariness" of the waiver encompasses the suspect's mental state and his "capacity for self-determination."[56] In *Moran v. Burbine* the United States Supreme Court wrote:

> *Miranda* holds that the defendant may waive effectuation of the rights conveyed in the warnings provided the waiver is made voluntarily, knowingly and intelligently. *The inquiry has two distinct dimensions.* First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate

---

[52] Supreme Court docket in No. 10, 2012, D.I. 34 at 6.

[53] *Id.* at 18 ("The now-retired Superior Court Judge considered the voluntariness of Wright's confession in three separate opinions.").

[54] *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010).

[55] *Colorado v. Spring*, 479 U.S. 564, 74 (1987) (internal citations omitted).

[56] *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.[57]

Not surprisingly the Delaware Supreme Court has drawn the same distinction.[58] Consequently, the judicial findings upon which the State relies—that Wright's waiver of his *Miranda* rights was voluntary or that his confession was voluntary—are not law of the case.[59]

Turning to the rulings themselves, the Court will begin its review with those cited by the Delaware Supreme Court when it held that Criminal Rule 61 barred consideration of the adequacy of the *Miranda* warnings. In its 2013 *Wright* opinion[60] the Supreme Court cited two of its rulings and two rulings of this Court for the proposition that "the admissibility of Wright's confession has been challenged and upheld repeatedly."[61] They are discussed separately below.

---

[57] 475 U.S. 412, 421 (1986) (emphasis added) (internal citations and internal quotation marks omitted).

[58] *E.g., Markward v. State,* 667 A.2d 1319, 1995 WL 496947, at *2 (Del. 1995) (TABLE); *Marine v. State*, 607 A.2d 1185, 1195-96 (Del. 1992).

[59] There are occasions when this Court wrote that Wright's waiver of his *Miranda* rights was "knowing, intelligent and voluntary." In each of those opinions, however, the only issue presented was whether his waiver was "voluntary;" the adequacy of the warnings given him was never argued.

[60] *State v. Wright*, 67 A.3d 319 (Del. 2013).

[61] *Id.* at 323. The cases discussed in the text were cited in footnote 12 of the Supreme Court's opinion.

*Wright v. State, 633 A.2d 329, 334–35 (Del.1993).*

This is the Supreme Court's opinion on Wright's direct appeal from his conviction. The *Miranda* warnings given to Wright were never mentioned in this opinion and their adequacy was never discussed. The Supreme Court listed the issues presented by Wright in that appeal:

> Wright raises five separate claims on appeal: (1) *his incriminating statements should have been suppressed because they were obtained following an unreasonable delay between arrest and initial presentment;* (2) jury instructions during the penalty phase of his trial were insufficient in defining mitigating circumstances; (3) the trial judge erred in her determination of non-statutory aggravating circumstances and mitigating circumstances; (4) imposition of the death sentence was disproportionate to the penalty imposed in similar cases; and (5) application to Wright of the death penalty statute, as revised after the date of the offenses, violated the *Ex Post Facto* Clause of the United States Constitution.[62]

As the highlighted portion shows, there was a dispute about the admissibility of Wright's statement, but this dispute had nothing to do with the *Miranda* warnings given him. Rather, it turned on whether "there was an unreasonable delay between arrest and presentment." The Supreme Court's conclusion in its 1993 opinion confirms that its decision about the statement's admissibility was limited to this issue:

> Wright was arrested shortly after the 6:00 a.m. raid on his residence. After administrative matters were concluded, questioning of him began around noon. For

---

[62]   *Wright v. State,* 633 A.2d 329, 333 (Del. 1993).

33

the next eight and one-half hours, he willingly spoke with detectives concerning various crimes about which he had knowledge, waiving his *Miranda* rights three times. He was given food, drink, and opportunities to use the restroom in a non-threatening atmosphere. As counsel for the State observed at oral argument, the length of the interrogation and resulting delay in presentment was largely the result of the fact that Wright had a lot to say and was willing to say it. *Under such circumstances, the trial court's determination that there was no unreasonable delay is clearly supported by the record* and the product of an orderly and logical deductive process. Consequently, Wright's first claim of error must be rejected.[63]

Finally, any lingering doubt that this opinion did not concern constitutional issues arising from *Miranda* is quickly dispelled by the Supreme Court's comment that "Wright concedes that the question of whether there was unreasonable delay is purely one of statutory construction under Delaware law."[64]

> *Wright v. State, 746 A.2d 277, 2000 WL 139974 (Del. 2000 ).*

This is a judgment order of the Delaware Supreme Court affirming this Court's 1998 denial of an earlier Rule 61 petition by Wright. The order reads in its entirety:

This 18th day of January 2000 upon consideration of the decisions of the Superior Court dated September 28, 1998 and December 18, 1997 and the briefs of the parties and their contentions in oral argument, it appears to this Court that: to the extent the issues raised on appeal are factual, the record evidence supports the trial judge's factual findings; to the extent the errors

---

[63] *Id.* at 336.
[64] *Id.* at 334.

> alleged on appeal are attributed to an abuse of discretion, the record does not support those assertions; and to the extent the issues raised on appeal are legal, they are controlled by settled Delaware law, which was properly applied.[65]

As is usually the case with such orders, there is no reference to the specific issues considered by the Supreme Court, so it is necessary to refer to the trial court's opinion to determine precisely what has been affirmed. That opinion is discussed immediately below; suffice it to say the adequacy of the *Miranda* warnings was never an issue.

*State v. Wright, 1998 WL 734771 (Del.Super. Sept. 28, 1998).*

As mentioned, this is the Superior Court opinion which gave rise to the Supreme Court's 2000 judgment order. It arose from Wright's second motion for post-conviction relief. The argument presented by Wright and decided by this Court did not concern the adequacy of the *Miranda* warnings actually given to Wright. Instead, Wright argued his heroin intoxication made it impossible for him to knowingly and voluntarily waive his rights. This court summarized Wright's contentions in its opinion:

> *Wright claims that his trial counsel was ineffective because he did not present evidence or argue that Wright's heroin intoxication at the time of his confession rendered him incapable of knowingly and intelligently waiving his*

---

[65] *Wright v. State*, 746 A.2d 277, 2000 WL 139974, at*1 (Del. 2000).

> Miranda *rights.* As a preliminary matter, the Court observes that, whether argued with particularity by counsel or not, the matter of Wright's knowing and intelligent waiver of his *Miranda* rights was addressed in Wright's suppression motion[66]

The Court never analyzed, or even mentioned, the actual warnings given to Wright.

Insofar as the confession itself is concerned, this Court focused on Wright's ability to understand the "words that the officers used during the interrogation." That issue turned on Wright's mental state, not the language of the warnings given to him:

> Although his testimony at the post conviction evidentiary hearing was learned and informative, Dr. Maslansky added no new information or analysis to his previous testimony at the 1992 guilt-phase trial. The value of Dr. Maslansky's ultimate conclusions is undermined by its lack of foundation. Dr. Maslansky was unaware, for example, that Wright already had a familiarity with his *Miranda* rights from previous arrests or that Wright had received *Miranda* warnings a number of times before giving his videotaped testimony. Dr. Maslansky's conclusions about the effect of heroin on Wright's ability to comprehend the questions posed during his interrogation were based on Wright's own estimate of how much heroin he had ingested. Such information was never corroborated and is inherently suspect. *At the hearing, Dr. Maslansky further conceded that Wright understood the words that the officers used during the interrogation, that there was no thought disorder, and that Wright was responsive to the officers' questions.* Finally, in earlier testimony that Dr. Maslansky gave during Wright's 1992 trial, he stated that Wright demonstrated an awareness of the consequences of what he said regarding his role in the murder in that he gave an

---

[66] *State v. Wright*, 1998 WL 734771, at *5 (Del. Super. Sept. 28, 1999) (emphasis added).

> explanation for what he did: He had to shoot Seifert or Dixon would have shot him.[67]

As close as this Court got to the adequacy of the *Miranda* warnings was to mention that Wright was aware of his right to remain silent. Once again, however, this was raised, however, in the context of his ability to understand and was not an examination of the warnings themselves:

> That Wright may not have fully grasped the ultimate consequences of his statements does not save him from his decision to speak *when he knew he had the right to remain silent. A criminal suspect need not know and understand every possible consequence of a waiver of the Fifth Amendment privilege,* and the police are not required to advise a suspect on every nuance of constitutional law as to whether he should speak or stand by his rights.[68]

In sum, nothing in this Court's 1998 opinion even purports to be a ruling on the adequacy of the warnings.

*State v. Wright, 1992 WL 207255 (Del. Super. Aug. 6, 1992).*

The adequacy of the *Miranda* warnings was not contested in the motion giving rise to this opinion either. Instead the issue addressed in this opinion related to the delay in bringing Wright before a judicial officer and the length of his interrogation:

---

[67] *Wright*, 1998 WL 734771, at *6 (emphasis added) (internal footnotes omitted).
[68] *Id.*

> There are two concerns which must be addressed regarding the time that the police interviewed the defendant: *first, the defendant alleges that he should have been presented after Detective Merrill's interview regarding the assault charge was completed; and second, the lengthy period of time during which the defendant was interviewed must be examined.*[69]

This Court's holding confirms that it was a question of the delay in bringing Wright before a judicial officer—not the adequacy of the *Miranda* warnings—which was decided:

> There is no evidence in this case of unreasonable delay in presenting the defendant to a judicial officer. The police finished searching the defendant's home, attended strategy meetings, interviewed Lester Mathis, and then began to interview the defendant. The defendant did not ask to end the interview or request the assistance of counsel. Instead, he voluntarily gave information about various crimes, including the Hi-Way Inn murder, to Detective Moser. Because the length of the interview was due to the defendant's continuing conversation with Detective Moser, *I hold that the delay was not unreasonable.*[70]

Having considered the rulings cited by the Supreme Court as constituting procedural bars under Criminal Rule 61, this Court will turn its attention to the remainder of the record. Perhaps the logical place to start is the suppression hearing this Court conducted before Wright's trial. Wright did not raise the adequacy of the warnings in his motion to suppress. Rather, he claimed "that his detention from the time of arrest until the time the statement was made was

---

[69] *State v. Wright,* 1992 WL 207255, at *2 (Del. Super. Aug. 6, 1992) (emphasis added).
[70] *Id.* at *4.

unreasonable and in violation of 11 *Del.C.* §1909 and Super.Ct.Crim.R. 5(a)."[71]   Also, as the trial judge later wrote, "[a]t the suppression hearing, the Court specifically considered whether Wright had the capacity to know what he was saying."[72]

None of this Court's other pre-trial or trial rulings considered the adequacy of the warnings.   This Court has also examined the Supreme Court's 1996 opinion in which Wright appealed from the denial of an ineffective assistance of counsel claim relating to his trial counsel's performance during the guilt phase of his trial, and in which he appealed the re-imposition of the death penalty following his second penalty hearing.[73]   No mention is made anywhere in that opinion of the adequacy of the warnings given Wright.

In its opposition to the current motion to suppress, the State directs the Court's attention to instances in which the name "*Miranda*" was mentioned or implied:

- "In this case, the interrogation began with a recitation of the *Miranda* rights."[74]

---

[71]   *Id.* at *1.
[72]   *Wright,* 1998 WL 734771, at *6.
[73]   *Wright v. State*, 671 A.2d 1353 (Del. 1996).
[74]   State's Resp. at (D.I. # 510) (quoting *State v. Wright,* I.D. No. 91004136DI, D.I.# 28, at 16-17 (Del. Super. Oct. 31, 1991).

- "Nor has the Defendant provided the Court with any proof that he did not understand the importance of his *Miranda* rights."[75]

- "Dr. Maslansky was unaware, for example, that Wright already had a familiarity with his *Miranda* rights from previous arrests or that Wright had received *Miranda* warnings a number of times before giving his video-taped testimony."[76]

- "At the hearing, Dr. Maslansky further conceded that Wright understood the words that the officers used during the interrogation, that there was no thought disorder, and that Wright was responsive to the officer's questions."[77]

- "A criminal suspect need not know and understand every possible consequence of a waiver of the Fifth Amendment privilege, and the police are not required to advise a suspect of every nuance of constitutional law as to whether he should speak or stand by his rights."[78]

- "Wright's claim of ineffective [assistance of counsel] is procedurally barred under Rule 61(i)(4) as well as substantively without merit because the waiver of his *Miranda* rights was knowing and intelligent."[79]

In none of the passages relied upon by the State (or in any other passage, for that matter) was there even a mention of the actual warnings given to Wright, much less a consideration of their adequacy. There is no reason to believe, therefore, that the Supreme

---

[75] *Id.* at 6.
[76] *Id.* at 8-9 (quoting *Wright,* 1998 WL 734771, at *6).
[77] *Id.* at 9.
[78] *Id.*
[79] *Id.*

Court or this court has ruled on the adequacy of the warnings given to Wright.

### C. The adequacy of the *Miranda* warnings was never previously presented to any Court.

Not only did the Supreme Court and this Court never decide whether the *Miranda* warnings given Wright were adequate, they also were never presented with this issue. It perhaps goes without saying that the surest way to determine whether an argument was presented is to examine the briefs or motions filed by the parties. The Sixth Circuit Court of Appeals recently articulated the significance of the briefing when determining whether an issue was decided for purposes of the law of the case doctrine:

> Application of these doctrines is limited to those questions necessarily decided in the earlier appeal. The phrase necessarily decided describes all issues that were *fully briefed and squarely decided* in an earlier appeal.[80]

The significance of the prior briefing in determining law of the case questions is underscored by the Delaware Supreme Court's long-standing practice that it will not decide issues unless they were fully briefed. For example, in *Roca v. E.I. DuPont de Nemours and Company* the Court summarized the rule this way:

---

[80] Kindle v. City of Jeffersontown, Ky., 2014 WL 5293680, at *5 (6th Cir. 2014) (internal quotations and quotations omitted).

> This Court has held that the appealing party's opening brief must *fully* state the grounds for appeal, as well as the arguments and supporting authorities on each issue or claim of reversible error. Casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue for appeal and *a fortiori* no specific mention of a legal issue is insufficient. The failure of a party appellant to present and argue a legal issue in the text of an opening brief constitutes a waiver of that claim on appeal. Accordingly, we hold that, assuming arguendo that Roca preserved the . . . issue in the Superior Court, Roca abandoned and waived that issue in his appeal to this Court by raising it for the first time at oral argument.[81]

Although *Roca* post-dates the Supreme Court's opinions on Wright's appeals, the rule requiring full briefing to preserve an issue was the same at the time of his appeals.[82] In light of this, there is no reason to believe that the Supreme Court would ever have ruled on the adequacy of the *Miranda* warnings unless that issue had been briefed.

This Court has reviewed the briefs and appendices in the two aforementioned Supreme Court appeals. Nowhere did the parties present any argument to the Supreme Court on the adequacy of the *Miranda* warnings given to Wright. Indeed, *Miranda* was not even mentioned in some of those briefs and mentioned only in passing in others. In any event there was never a discussion in the briefing of the requirements of *Miranda*:

---

[81] 842 A.2d 1238, 1242-43 (Del. 2004).

[82] *E.g*, .*Black v. State*, 625 A.2d 278, 1993 WL 132989 (Del. 1993) ("The failure to brie**f** an issue that was raised below constitutes a waiver and abandonment of that issue on appeal"); *Barr v. State*, 571 A.2d 786, 1989 WL 160445, at *2 (Del. 1989) (Appellant "has failed to argue the point in his brief, or even to refer to it. We conclude that Barr has waived or abandoned this contention.").

- In Wright's direct appeal in 1993 neither Wright nor the State cited *Miranda* in any of their briefs, and neither side made mention in the briefs of the language used by Detective Mayfield in his warnings.

- In his two briefs filed in connection with the Supreme Court's 2000 decision Wright again did not cite *Miranda.* The State cited *Miranda* in passing on three occasions in its brief, but not in connection with the warnings given by Detective Mayfield. Once again, neither side referred to the language of the warnings given by Detective Mayfield, nor did either side include the transcript of those warnings in its appendix. The Supreme Court therefore had no information in this appeal about the contents of the warnings given to Wright.

This Court has similarly examined the papers filed with this court in connection with its opinions. There was no reference to the adequacy of the *Miranda* warnings in any of those papers. The Court finds, therefore, that the adequacy of the *Miranda* warnings was never presented to either this Court or the Supreme Court. It necessarily follows that neither court ever decided the issue.

### D. Because the adequacy of the *Miranda* warnings was never decided, Wright's arguments are not barred by law of the case.

The hierarchical nature of our judicial system demands that an inferior court faithfully adhere to the directions given it by an appellate court. This obligation is sometimes referred to as the

"mandate rule." That rule requires adherence to the decisions of the appellate court but leaves the inferior court free to make such other rulings as it sees fit. "While the mandate does not control a trial court as to matters not addressed on appeal, the trial court is bound to strictly comply with the appellate court's determination of any issues expressly or impliedly disposed of in its decision."[83] The mandate is limited to only those matters which were actually decided. The trial court is "free to make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court not settled by the decision."[84] Given that the Supreme Court never decided or even took up the issue whether the warnings given Wright were sufficient, its opinions do not prohibit this Court from considering Wright's *Miranda* argument.

As discussed previously, this Court's earlier decisions are not law of the case insofar as Wright's *Miranda* argument is concerned because, like the Supreme Court, it never ruled on that argument. But even assuming that this Court had, in fact, previously ruled on Wright's *Miranda* claims, such a ruling would not necessarily spell their end. A court has considerably more flexibility when applying the

---

[83] *Insurance Corp. of Am.*, 628 A.2d at 39.
[84] *Motorola Inc.*, 958 A.2d at 860.

law of the case doctrine to its own decisions. In such instances the doctrine "is not an absolute bar to reconsideration of a prior decision that is clearly wrong, produces an injustice or should be revisited because of changed circumstances."[85] Under the circumstances presented here, the Court would not feel constrained by the law of the case doctrine to follow the hypothetical ruling by this Court. It is true that the law of the case doctrine serves to promote finality and judicial economy. But it was never intended to foster an injustice, particularly in a capital case. Our Supreme Court has "recognized the importance of finality in criminal litigation and especially in the context of capital litigation. Balanced against that interest, however, is the important role of courts in preventing an injustice."[86] Precluding review, under the banner of finality and judicial efficiency, of a meritorious contention never previously raised is inconsistent with this Court's role of preventing injustice. Almost seventy-five years ago Hugo Black wrote:

> Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out

---

[85] *Hoskins*, 102 A.3d at 79 (quoting *Gannet Co. v. Kanaga*, 750 A.2d 1174, 1181 (Del. 2000).
[86] *Zebroski v. State*, 12 A.3d 1115, 1120 (Del. 2010). Our Supreme Court is "acutely sensitive to the special scrutiny capital cases merit on review." *Jackson v. State,* 21 A.3d 27, 37 (Del. 2011).

of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice.[87]

The same holds true today.

In sum, because neither the Supreme Court nor this Court has ever been presented with and never decided the specific issue whether the warnings given to Wright were adequate, his *Miranda* claims are not barred by the doctrine of the law of the case.

## II. Wright's confession must be suppressed because the warnings given to him by the interrogating detective do not satisfy *Miranda.*

Courts do not require police officers to recite the warnings exactly as they appear in the *Miranda* opinion. Rather, officers are free to use whatever language they want so long as it reasonably conveys the essence of the warnings in *Miranda* and does not suggest any limitation on the so-called rights. The warnings given to Wright are deficient because they suggest a limitation on Wright's right to court-appointed counsel. In particular, the officer told Wright he was entitled to a court-appointed attorney "if the State feels . . .[you] need[] one." This, of course, is untrue—Wright's entitlement to a court-appointed attorney is not a matter of grace from the State.

---

[87] *Hormel v. Helvering,* 312 U.S. 552, 557 (1941).

Rather, he had an absolute right to a court-appointed attorney if he wanted one. The warnings given to him fail to satisfy *Miranda* and the ensuing statement must, as a matter of law, be suppressed.

## A. The warnings given to Wright.

The first step in analyzing the sufficiency of the warnings is to identify precisely which of them must be scrutinized. In its 2012 opinion this Court addressed whether the State was required to refresh the *Miranda* warnings allegedly give to Wright before interrogations preceding Detective Mayfield's. The Court weighed the required factors set forth in *Ledda v. State*[88] and concluded:

> Perhaps no single factor discussed above would have required re-administration of the *Miranda* warnings, but after considering the circumstances in their totality of the circumstances, including the *Ledda* factors and Wright's obviously impaired condition, the court finds that Detective Mayfield was obligated to re-administer the warnings to Wright before he began his interrogation.[89]

The State did not challenge this Court's application of *Ledda* when it appealed that decision. More importantly, in the instant motion to suppress Wright expressly relied upon this Court's ruling that a balancing of the *Ledda* factors required that Detective Mayfield give a new set of warnings to him. Yet, the State again chose not to dispute

---

[88] 564 A.2d 1125 (Del.1989).
[89] *Wright,* 2012 WL 1400932, at*44.

this holding. It is well settled that the failure to brief an argument constitutes a waiver of that argument.[90] The State's silence is therefore dispositive of this issue, and the court adheres to its earlier ruling that Detective Mayfield was required to give a fresh set of *Miranda* warnings to Wright. Accordingly, the issue here is whether the specific warnings given by Detective Mayfield satisfy *Miranda*.[91]

## B. The requirements of *Miranda*.

A core principle of the Bill of Rights is that coerced confessions are not admissible in the trial of the accused. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." Over the years the Supreme Court "has recognized and applied several prophylactic rules designed to protect

---

[90] Superior Court Criminal Rule 12(f) provides:

> **(f) Effect of Failure to Raise Defenses or Objections.** Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to subdivision (c), or prior to any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

The State has never asked for relief from its decision not to brief the *Ledda*-issue. Consequently, the State has waived any argument that this court incorrectly applied *Ledda. Brown v. United Water Del., Inc*, 3 A.3d 272, 276 (Del. 2010) (party's decision not to brief issue in Superior Court constitutes waiver).

[91] Even assuming the State had not waived any argument that Detective Mayfield was required to refresh the *Miranda* warnings, it is questionable whether the State could successfully rely on the earlier warnings allegedly given to Wright. "Under Miranda the burden of proving that proper warnings were given is on the government. . . . While there was testimony that the police officers read to appellant a card concerning his rights, the evidence does not demonstrate that a constitutionally adequate warning was given. The government's burden may not be met by presumptions or inferences that when police officers read to an accused from a card they are reading Miranda warnings or that what is read, without revelation of its contents, meets constitutional standards." *Moll v. United States*, 413 F.2d 1233, 1237-38 (5th Cir. 1969). If the State had failed to prove that adequate warnings had been given to Wright by Detective Merrill or Detective Moser Wright's confession would possibly be suppressed because a statement given after a *Miranda* warning is inadmissible of the defendant first gave an unwarned confession. *Missouri v. Seibert,* 542 U.S. 600 (2004). Because of this court's unchallenged *Ledda*-ruling it need not reach these issues.

the core privilege against self-incrimination."[92] Foremost among these is the proverbial landmark 1966 decision in *Miranda v. Arizona.*[93] Before *Miranda* the admissibility of a confession was determined solely on the basis whether it was "voluntary" as that term was understood under the Due Process Clause.[94] The *Miranda* Court "presumed that interrogation in certain custodial circumstances is inherently coercive and that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights."[95] According to the *Miranda* court, the defendant

> [M]ust be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.[96]

The prophylactic *Miranda* warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected."[97]

---

[92]  *United States v. Pantene*, 542 U.S. 630, 637 (2004).
[93]  384 U.S. 436 (1966).
[94]  *E.g.*, *Haynes v. Washington,* 373 U.S. 503, 513-14 (1963) (Defendant's written confession was involuntary and therefore inadmissible where it was made while the defendant was held by the police incommunicado and after he was told by police officers that he could not communicate by telephone with his wife until after he made written confession.).
[95]  *New York v. Quarles,* 467 U.S, 649, 654 (1984).
[96]  384 U.S. at 479.
[97]  *Michigan v. Tucker*, 417 U.S. 443, 444 (1974).

The United States Supreme Court has, on several occasions, visited the issue whether particular warnings given to a suspect complied with the requirements of *Miranda.* The Court's most recent such occasion was *Florida v. Powell*[98] which, the State contends is central to this issue. *Powell* cannot be considered in a vacuum because, as the Court wrote, "[o]ur decisions in *Prysock*[99] and *Duckworth*[100] inform our judgment here."[101] Taken together, these three opinions—*Prysock, Duckworth,* and *Powell*—provide guidelines for evaluating the sufficiency of warnings given to a suspect. Most notable among them is the principle that the warnings cannot convey a limitation on the rights *Miranda* requires to be conveyed to the suspect.

### *California v. Prysock*[102]

The defendant in this case contended that although the warnings conveyed to him that he had the right to counsel during questioning, they did not explicitly state that he had the right to *court-*

---

98 559 U.S. 50 (2010).
99 453 U.S. 355 (1981).
100 492 U.S. 195 (1989).
101 559 U.S. at 60.
102 453 U.S. 355 (1981).

*appointed* counsel during questioning.[103]  The defendant was advised in pertinent part as follows:

> You have the right to talk to a lawyer before you are questioned, have him present with you while you are being questioned, and all during the questioning. Do you understand this?
>
> * * *
>
> You all, uh,—if,—you have the right to have a lawyer appointed to represent you at no cost to yourself. Do you understand this?[104]

The Court's analysis began with the principle that *Miranda* and its progeny do not require a strict, talismanic incantation of the warnings as they were articulated in *Miranda.*[105]  What is required, however, is that the warnings touch all four bases, that is, they must reasonably convey all four of the *Miranda* warnings, without suggesting a limitation on any of those rights.

The *Prysock* Court compared the warnings given to the defendant with warnings in two lower court cases in which the courts found the warning to be inadequate.[106]  In one case the defendant was advised she had "an attorney appointed to represent you when you first appear before the U. S. Commissioner or the Court."[107]  In the

---

[103]  *See id.* at 558-59.
[104]  *Id.* at 357.
[105]  *Id.* at 359-60.
[106]  *Id.* at 360-61.
[107]  *United States v. Garcia*, 431 F.2d 134, 134 (9th Cir. 1970) (per curiam).

other the defendant was told "*if he was charged ... he would be appointed counsel.*"[108] The warnings in these two cases were defective, according to the Supreme Court, because "[i]n both instances the reference to appointed counsel was linked to a future point in time after police interrogation, and therefore did not fully advise the suspect of his right to appointed counsel before such interrogation."[109] The Supreme Court found the warnings given to Prysock to be critically different because "[h]ere, in contrast, *nothing in the warnings given [Prysock] suggested any limitation on the right* to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general."[110] The proverbial bottom line is: he warnings cannot suggest a limitation on the right to appointed counsel.

*Duckworth v. Eagan*

The second case in the trilogy is *Duckworth v. Eagan,*[111] where police gave the defendant the following warning:

---

[108] *People v. Bolinski*, 67 Cal.Rptr. 347, 355 (Cal. App.1968).
[109] 453 U.S. at 360.
[110] *Id.* at 360-61.
[111] 492 U.S. 195, 198 (1989) (emphasis in original). Eagan made an ostensibly exculpatory statement after receiving the warnings quoted in the text. *Id.* The next day Eagan was questioned a second time. *Id.* Prior to that questioning he signed a form in which he acknowledged he was told "that if I do not hire an attorney, one will be provided for me." *Id.* at 199. Eagan admitted his participation in the crime during the second round of questioning. *Id.* The issue before the Supreme Court turned on the adequacy of the first warnings. *Id.* at 201-02. The warnings given Eagan before his second interrogation did not figure in the Supreme Court's analysis. *Id.* at 203-05.

Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. *You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.* You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer."[112]

Defendant Eagan argued that the portion of the warning—"we have no way of giving you a lawyer, but one will be appointed for you if and when you go to court"—rendered the warnings inadequate because it conveyed to that he was not entitled to a court-appointed attorney during any interrogation.[113]

The analysis in *Duckworth* again began with the observation that *Miranda* does not require adherence to the "exact form" of the language used in that opinion to describe the required warnings.[114] The Court upheld the warnings because they "touched all the bases," and taken as a whole did not suggest a limitation on the right to appointed counsel.[115] It noted that the defendant was told he had the "right to talk to a lawyer" both "before we ask you any questions" and

---

[112] *Id.* at 199.
[113] *Id.*
[114] *Id.* at 202.
[115] *Id.* at 203.

"during questioning."[116]  In the sentence immediately following, the defendant was told he had a right to the advice and presence of a lawyer even if he could not afford one.[117]  Taken together, these two sentences reasonably conveyed that the defendant was entitled to a lawyer before and during questioning even if he could not afford one.[118]

The Supreme Court rejected the notion that the "if and when you go to court" language negated those warnings by suggesting a limitation on the defendant's right to court-appointed counsel.[119] Rather, "[w]e think it must be relatively commonplace for a suspect, after receiving *Miranda* warnings, to ask *when* he will obtain counsel. The 'if and when you go to court' advice simply anticipates that question."[120]

Insofar as the present case is concerned, the key to *Duckworth* is that the defendant was explicitly told he had the "right to the advice and presence of a lawyer even if you cannot afford to hire one."  That never occurred here.  Wright was only told he would have an attorney

---

[116]  *Id.* at 198.
[117]  *Id.*
[118]  *Id.*
[119]  *Id.* at 204.
[120]  *Id.*

appointed for him only if the State felt he needed one; he was never told he had an unconditional right to appointed counsel.

*Florida v. Powell*[121]

The State told both this Court and the Supreme Court that "*Powell*'s relevance to Wright's case can hardly be overstated."[122]  In *Powell* the police read the defendant his *Miranda* rights from a card and the defendant also signed a waiver form acknowledging he had received those rights and was willing to waive them.[123]  The warnings given to Powell were far more understandable than those given to Wright.  The defendant in *Powell* was advised:

> You have the right to remain silent. If you give up the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview.[124]

He contended that the warning "you have the right to talk to an attorney before answering any our questions" conveyed that he had

---

[121]  559 U.S. 50 (2010).
[122]  Supreme Court Docket in No. 10, 212; D.I. 34 at 28.
[123]  559 U.S. at 53-54.
[124]  *Id.* at 54.

the right to speak to an attorney before questioning began but not during the questioning itself.[125]

The *Powell* Court's analysis began with the now-familiar adage that when determining the adequacy of the warnings given to a defendant courts should not parse the warnings as if they were "construing a will or defining the terms of an easement."[126]  Rather, the "inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda.*"[127]  Of particular importance to Wright's claim, the *Powell* court repeated that a key element in this inquiry was whether the warnings suggested any limitation on the *Miranda* rights:

> Our decisions in *Prysock* and *Duckworth* inform our judgment here. Both concerned a suspect's entitlement to adequate notification of the right to appointed counsel. In *Prysock*, an officer informed the suspect of, *inter alia,* his right to a lawyer's presence during questioning and his right to counsel appointed at no cost.  The Court of Appeals held the advice inadequate to comply with *Miranda* because it lacked an express statement that the appointment of an attorney would occur prior to the impending interrogation. We reversed. "*[N]othing in the warnings,*" we observed, "*suggested any limitation on the right* to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general, including the right to a lawyer before [the suspect is] questioned, ... while [he is] being questioned, and all during the questioning." [128]

---

[125]  *Id.*
[126]  *Id.* at 60 (quoting *Duckworth*, 492 U.S. at 203).
[127]  *Id.* at 59 (internal alterations, citations and quotations omitted).
[128]  *Id* (emphasis added) (internal citations omitted).

The *Powell* court upheld the warnings given there because they would reasonably be understood to mean that the defendant had a right to counsel during questioning.[129]  To reach the opposite conclusion—that the suspect had a right to consult with counsel before, but not during, questioning—would require the suspect to first "come to the counterintuitive conclusion that he is obligated, or allowed, to hop in and out of the holding area to seek his attorney's advice [during the questioning]. Instead, the suspect would likely assume that he must stay put in the interrogation room and that his lawyer would be there with him the entire time."[130]

A synthesis[131] of these three opinion yields, at a minimum, the following principles:

1. The police are not required to recite the Warnings *verbatim* as they appear in *Miranda.*

2. The police must "touch all the bases" of *Miranda* and explain them in understandable terms.

3. The police cannot suggest any limitation or precondition on any of the rights described in the *Miranda* warnings.

---

[129]  *Id.* at 62.
[130]  *Id.* at 62-63.
[131]  This synthesis is similar to the standard for judging the adequacy of jury instructions: "The test is whether the jury instruction correctly states the law and is not so confusing or inaccurate as to undermine the jury's ability to reach a verdict. A trial court's jury instruction is not a ground for reversal if it is reasonably informative and not misleading, judged by common practices and standards of verbal communication." *Perkins v. State*, 920 A.2d 391, 398 (Del. 2007). The warning given here would not meet this standard because the warning was inaccurate—it told Wright he could only have a court-appointed attorney if the state felt he needed one.

The most important for present purposes is the principle—which comes from *Prysock* and is reiterated in *Powell*—that the police cannot suggest any limitations or preconditions on the rights described in *Miranda.* The importance of this principle is emphasized in an opinion upon which the State itself relies—the Third Circuit's decision in *United States v. Warren*:[132]

> Rather, as the *Powell* decision underscores in quoting *Prysock,* attention must be focused upon whether anything in the warning suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general, including the right to a lawyer before the suspect is questioned, while he is being questioned, and all during the questioning.[133]

Other federal courts of appeal have drawn the same conclusion. The Eleventh Circuit, for instance, has opined that "*Prysock* thus stands for the proposition that a Miranda warning is adequate if it fully informs the accused of his right to consult with an attorney prior to questioning and does not condition the right to appointed counsel on some future event."[134]

In short, the Court must examine the warnings to determine if they explain all four of the so-called *Miranda* rights and do not suggest any limitation on any of those rights.

---

[132] 642 F.3d 182 (3d Cir. 2011).
[133] *Id.* at 185 (internal alterations and quotations omitted).
[134] *United States v. Contreras,* 667 F.2d 976, 979 (11th Cir. 1982).

## C. Why the warning was defective.

The warnings given by Detective Mayfield fail to satisfy *Miranda* because they contain a limitation on Wright's right to appointed counsel. As mentioned several times previously, the detective told Wright "[c]an't afford to hire one, if the state feels that you're diligent and needs one, they'll appoint one for you." The idea conveyed to Wright that his right to appointed counsel was dependent upon the State's decision he "needs one" is wholly inconsistent with *Miranda.* According to the *Miranda* Court, "[i]f the individual desires to exercise his privilege, he has the right to do so. This is not for the authorities to decide."[135]

This case is little different than the one before the Maryland Supreme Court in *State v. Luckett*:

> [N]o police officer advising a suspect of his rights under *Miranda* should intimate, much less declare affirmatively, a limitation upon the right to counsel. Detective Barba's statements that the right to counsel applied only to discussion of the specifics of "the case," being wrong as a matter of law, rendered the advisements constitutionally infirm. The constitutional infirmity of the warnings rendered similarly infirm Respondent's subsequent waiver of his rights, because his purported waiver was not made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.[136]

---

[135] *Miranda*, 384 U.S. at 480.
[136] 993 A.2d 25, 28 (Md. 2010) (internal footnote and quotation marks omitted*); see also Commonwealth v. Seng,* 766 N.E.2d 492, 545 (Mass. 2002) (Warning that " if you don't have money for a lawyer, they can help find one for you," was defective.).

In the instant case the detective "declare[d] affirmatively a limitation on the right to counsel"—he told Wright he could have court appointed counsel only if the State feels he needed one.

Another case illustrating the error of telling the defendant his entitlement to a court-appointed lawyer was dependent upon the State's approval is the Ninth Circuit's decision in *United States v. Connell.*[137] In that case warnings to the defendant that "a lawyer *may* be appointed to represent you*" and if the defendant wanted a lawyer but could not afford one "arrangements will be made for me to obtain a lawyer in *accordance with the law*" were held to be defective because the police also told the defendant that "you must make your own arrangements to obtain a lawyer and this will be at no expense to the government."[138] Of particular significance in *Connell* was that the language "the government *may* appoint one for you" suggested that the defendant's right to counsel was dependent upon the government's approval. The court reasoned:

> Application of the above principles to the facts of Connell's case compels the conclusion that the warnings at issue fell below minimum required standards. Like the warnings issued in *Garcia* and *Twomey,* the warnings Connell received were equivocal and open to

---

[137] 869 F.2d 1349 (9th Cir. 1989)
[138] *Id.* at 1350-51, 1353.

misinterpretation. Although told that he had the right to talk to an attorney before, during, and after questioning, this statement was immediately followed by a strong assertion that such an attorney could not be obtained at the Government's expense. The subsequent statements regarding appointed counsel in both the oral and written warnings—that "a lawyer *may* be appointed to represent you" (oral) and that if I want but cannot afford a lawyer "arrangements will be made for me to obtain a lawyer in *accordance with the law* " (written)—did not clearly inform Connell that if he could not afford an attorney one would be appointed for him prior to questioning, if he so desired. The oral warning, using the word "may", *leaves the impression that providing an attorney, if Connell could not afford one, was discretionary with the government,* particularly in light of the previous strong statement that "you must make your own arrangements to obtain a lawyer and this will be at no expense to the government.[139]

The Court of Appeals invalidated the warnings because they left "the impression providing an attorney if Connell could not afford one was discretionary with the government."[140] The same is true of a warning which told Wright he was entitled to court-appointed counsel "if the State feels . . . [you] need[] one."

## D. The State's other arguments.

The State raises several arguments, none of which require a different result. It should be recalled that the State was responding to a three-pronged motion to suppress—(1) the *Miranda* warnings were inadequate; (2) Wright's waiver of his *Miranda* rights was not

---

[139] *Id.* at 1353.
[140] *Id.*

voluntary; and (3) Wright's confession was not voluntary. It may well be that certain of the State's arguments in its response were not addressed to the first prong, but rather to one of the latter two. Nonetheless the Court will separately consider them.

### 1. Simply advising Wright he had a right to counsel is not sufficient.

In its brief in its 2012 appeal to the Delaware Supreme Court,[141] and again here, the State urges that Detective Mayfield told Wright he had a right to counsel. The State stressed that Detective Mayfield told Wright that "[y]ou have the right, right now, at any time, to have an attorney present with you." This is fine as far as it goes, but it falls short because it does not tell Wright that he has a right to a court-appointed attorney if he cannot afford one. According to the *Miranda* court the right to have an attorney present and the right to a court-appointed attorney are distinct and both must be covered:

> In order fully to apprise a person interrogated of the extent of his rights under this system then, *it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him.* Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected

---

[141] Supreme Court Docket in No. 10, 2012: D.I. 34.

to interrogation—the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it.[142]

The Supreme Court has stated that "the four warnings *Miranda* requires are invariable."[143] Advice to a suspect that he has "the right, right now, at any time to have an attorney present with you" is therefore no substitute for the invariable requirement that the suspect be advised he is entitled to *free* counsel if he is indigent.

While on the subject of the four "invariable" *Miranda* warnings, the Court will distinguish some dictum from the Delaware Supreme Court which neither side has mentioned. The Court is not in the habit of setting up straw men and knocking them down, but in this instance it will mention the Delaware Supreme Court's opinion *Crawford v.* State,[144] even though the State has not relied upon it. In *Crawford* our Supreme Court was confronted with a claim that a suspect had invoked his right to counsel and therefore his statement should have been suppressed—an issue not present here. During the course of its analysis the court referred to the United State's Supreme

---

[142]   *Miranda*, 384 U.S. at 480 (emphasis added).
[143]   *E.g.*, *J.D.B. v. North Carolina* , ___U.S.___, 131 S.Ct. 2394, 2401 (2011).
[144]   580 A.2d 571 (Del. 1990).

Court's decision in *Michigan v. Tucker*[145] and suggested in a parenthetical expression following a citation that *Tucker* stands for the proposition that a "failure of interrogating officers to advise suspect of right to appointed counsel did not invalidate an otherwise voluntary statement."[146] Specifically the *Crawford* court wrote:

> Although it has not specifically addressed the question of an ambiguous invocation of the right to counsel, the Supreme Court has considered related issues on several occasions. *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) (since the procedural rules of *Miranda* were not themselves rights protected by the constitution, strict adherence to the form suggested in *Miranda* was not constitutionally required, *thus failure of interrogating officers to advise suspect of right to appointed counsel did not invalidate an otherwise voluntary statement*).[147]

Because it was unnecessary to the *Crawford* Court's holding, its interpretation of *Michigan v. Tucker* is dictum and is not binding upon this Court. It is therefore permissible for this Court to say that it has a different view of the holding in *Tucker.* The issue before the United States Supreme Court in *Tucker* was whether a statement taken in violation of *Miranda* could be used to impeach the defendant if he testified. The officer in that case failed to advise the defendant of his right to appointed counsel, and the lower courts held that this

---

[145] 417 U.S. 433 (1974).
[146] *Crawford*, 580 A.2d at 574.
[147] *Id.*

omission required suppression of his statement.[148]  That holding was never disturbed by the Supreme Court.[149]  To the contrary the high court observed that *Miranda* had been satisfied because Tucker's statement was excluded during the prosecution's case in chief:

> Our determination that the interrogation in this case involved no compulsion sufficient to breach the right against compulsory self-incrimination does not mean there was not a disregard, albeit an inadvertent disregard, of the procedural rules later established in Miranda. The question for decision is how sweeping the judicially imposed consequences of this disregard shall be. This Court said in Miranda that statements taken in violation of the Miranda principles must not be used to prove the prosecution's case at trial. That requirement was fully complied with by the state court here.[150]

*Tucker* therefore does not support the notion that an interrogating officer may omit the required advice about the right to a free attorney so long as the officer simply tells the suspect he has a right to counsel.  To the contrary, *Tucker* reinforces the essential nature of the advice about a court-appointed attorney, and that the omission of such advice requires exclusion during the prosecution's case-in-chief.

### 2. *Duckworth v. Eagan* is distinct

The State directs this Court's attention to the United State's Supreme Court's holding in *Duckworth v. Eagan.*  That case is readily

---

[148]  417 U.S. at 437-38.
[149]  *Id.* at 445.
[150]  *Id.*

distinguished from the present matter. As discussed previously, the *Duckworth* Court upheld a warning in which the suspect was told that a lawyer would be appointed for him "if and when you go to court." The Supreme Court based its holding on the fact that the suspect was also told that he had a right to counsel before and during questioning and, in the immediately following sentence, that one would be appointed for him if he could not afford one.[151] In this case the detective never told Wright that he had the unconditional right to appointed counsel; instead he was only told that a lawyer would be appointed for him if the State felt he needed one. Thus this case, unlike *Duckworth*, lacks a catchall phrase that would have apprised Wright of his right.

### 3. Adequate *Miranda* warnings are not a mere "component part"

The State also suggests that the Court should ignore the defective *Miranda* warnings if it finds that Wright's confession was voluntary.[152] In its opposition to the motion to suppress it argues:

---

[151] The warning given in *Duckworth* was:
> You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. 492 U.S. at 198.

[152] The State uses the terms "voluntary waiver of *Miranda* rights" and "voluntary confession" interchangeably. They are, however, distinct concepts. The State begins its argument with the assertion "[i]t is the *voluntariness of a confession*. . .that courts must employee when reviewing a defendant's confession," which is immediately followed by a discussion that "[t]he Delaware Supreme Court has adopted a two-part test to determine whether a *waiver of Miranda is voluntary*."

> As the United States Supreme Court has repeatedly held, *Miranda* warnings are prophylactic, and *Miranda* did not create a substantive right. *It is the voluntariness of a confession, with the provision of Miranda warnings functioning as an important component in the totality of circumstances analysis that courts must employee when reviewing a defendant's confession.* The Delaware Supreme Court has developed a two-part test to determine whether a waiver of *Miranda* is voluntary . . . .

This argument is contradicted by the United States Supreme Court, which on numerous occasions has held that effective *Miranda* warnings are an absolute prerequisite to admission of a confession. While it is true that the *Miranda* warnings given a suspect in a custodial interrogation are part of the mix to be considered when determining whether the waiver of those rights is voluntary, it would be a mistake to relegate them to a mere "component in the totality of circumstances" to be considered in making that determination. Rather, adequate warnings are essential, and without them any ensuing statement is inadmissible as a matter of law during the prosecution's case-in-chief. They are "prerequisites to the admissibility of any statement made by a defendant."[153] "The central principle established by [*Miranda*]," according to the Supreme Court, is "if the police take a suspect into custody and then ask him questions without informing him of the rights enumerated above, his

---

[153] *Miranda*, 384 U.S. at 476; *Schneckloth*, 412 U.S. at 232 ("[I]n *Miranda* . . ., we found that the Constitution required certain now familiar warnings as a prerequisite to police interrogation.").

responses cannot be introduced into evidence to establish his guilt."[154] Put another way, *Miranda's* "core ruling [is] that unwarned statements may not be used as evidence in the prosecution's case in chief."[155]

### 4. Wright's previous experience with *Miranda* warnings is irrelevant

The State points out that Wright has had previous experience with *Miranda* warnings. That experience, whatever it might be, does not lessen the obligation of the police to give adequate *Miranda* warnings:

> Whether a suspect in custody is mature or young, a Ph.D. or a high school drop-out, a repeat offender familiar with the criminal justice system or an individual with a previously clean record does not vary the fact that sufficient *Miranda* warnings must be given.[156]

### 5. The jury's verdict does not validate the warnings given

The State refers to the jury verdicts in Wright's first trial (in the guilt and penalty phases) and its verdict after Wright's second penalty hearing. The adequacy of the *Miranda* warnings is a question of law for the court, not a question of fact for the jury.[157]

---

[154]  *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984).
[155]  *Dickerson v. United States,* 530 U.S. 428, 443–44 (2000).
[156]  *Rush v. State*, 939 A.2d 689, 703 (Md. 2008).
[157]  *Connell,* 869 F.2d at 1351 ("Whether Connell was given adequate *Miranda* warnings is a question of law."); *United States v. Caldwell,* 954 F.2d 496, 501 (8th Cir. 1992); *United States v. Campbell,* 2008 WL 202555, at *2 (S.D. Fl. Jan. 23, 2008); *Commonwealth  v. Edwards,* 830 N.E.2d 158, 165 (Mass. 2005).

## E. Suppression is required

Every day that a police officer leaves for work the officer does so uncertain that he or she will return home at the end of the shift. At any moment a police officer can face an unexpected, split-second decision in which a life can hang in the balance. In the words of the United States Supreme Court, "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."[158] Indeed, there are emergency situations in which the *Miranda* warnings need not be given before custodial questioning:

> [T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers . . . in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence.[159]

This, however, was not such a situation. Wright was in a tightly controlled situation, and the police were not faced with any on-going emergency at the time he was interrogated.

---

[158] *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).
[159] *New York v. Quarles*, 467 U.S. 649, 656 (1984).

Courts do not "expect police officers to read *United States Reports* in their spare time, to study arcane constitutional law treatises, or to analyze constitutional developments with a law professor's precision,"[160] but as discussed previously, the strictures of *Miranda* were familiar by the time Wright was questioned and police in Delaware, as elsewhere, had developed adequate procedures designed to insure compliance with them. Nonetheless, Wright did not receive warnings which even arguably satisfied *Miranda.* "The *Miranda* rule is not a code of police conduct,"[161] but rather is a prophylactic rule designed to protect core constitutional rights. There is only one remedy here—Wright's confession must be suppressed and the State cannot use that confession during its case-in-chief. The *Miranda* Court itself made it clear that the "warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant."[162] There is simply no reason here to allow the admission of a statement obtained in violation of *Miranda.* Therefore the court has no choice but to suppress Wright's statement.

---

[160] *Ganwich v. Knapp,* 319 F.3d 1115, 1125 (9th Cir. 2003).
[161] *United States v. Patane*, 542 U.S. 630, 636 (2004).
[162] *Miranda*, 384 U.S. at 476.

**Wherefore,** Defendant's motion to suppress is **GRANTED.**


Date:       February 2, 2015        _____
                                                John A. Parkins, Jr.
                                                Superior Court Judge



oc:    Prothonotary